**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DAVID YANG,

      Plaintiff,

    v.

FEDEX FREIGHT, INC., ROBERT VANDE
HEI, ROGER MACO, and KEVIN LEE,

      Defendants.

No. 15 CV 1037

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff David Yang worked for defendant FedEx Freight, Inc., first as a
dock worker and then as a driver. Yang believes he experienced a number of
injustices while working for FedEx, and he attributes this poor treatment to his
managers' and co-workers' racist attitudes against Asian Americans. Over four
years into his employment, Yang got into a heated exchange with a co-worker. Both
employees complained to management, and Yang reported that the co-worker used
a racial slur against him. Management spoke with each employee individually, and
relieved both of them of duty until a formal investigation could be completed and a
disciplinary determination could be made. In his conversation with management,
Yang came to believe that he had no choice but to resign and seek employment
elsewhere, so he tendered his resignation the next day. He later learned that his co-
worker returned to work after just three days. Yang filed suit against FedEx and
some of his supervisors under 42 U.S.C. § 1981 for racial discrimination, hostile

work environment, and retaliation. Defendants move for summary judgment. For the following reasons, defendants' motion is granted.

## I.     Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

When a proposed statement of fact is supported by the record and not properly controverted by the opposing party, that statement will be accepted as true. *See* N.D. Ill. Local Rule 56.1(b)(3)(c); *id.* 56.1(a); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). To adequately dispute a factual statement, the opposing party must cite specific support in the record. *See* N.D. Ill. Local Rule 56.1(b)(3). Uncorroborated, self-serving testimony may be used to dispute a material fact, but only if based on personal knowledge or firsthand experience. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). But a denial

based on argument or conjecture does not create a genuinely disputed issue of material fact. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).

## II.     Facts[1]

Plaintiff David Yang, an Asian American man, began working for defendant FedEx Freight, Inc. on October 12, 2009. [48] ¶¶ 3, 9. FedEx transports large freight for businesses that do not have their own fleets of trucks, employing drivers to move the shipments between its service centers and between service centers and customers, and employing dock workers to load and unload freight at the service centers. [48] ¶ 8. Yang started out as a part-time dock worker at FedEx's Aurora service center and continued in that capacity until January 31, 2011. [48] ¶ 10.

In the spring of 2010, Yang asked his manager at the Aurora service center, defendant Robert Vande Hei, about applying to the company's "dock-to-driver" program. [54] ¶ 2. Admission to that program would allow Yang to become a driver—a position with higher pay than his dock worker job. [54] ¶ 1. Yang believed he needed Vande Hei's approval to apply for the program, although he did not have a clear idea as to how the application process worked. [48] ¶ 65; [54] ¶ 2. Vande Hei told Yang that he would get back to him later. [54] ¶ 3. Yang claims that he followed up with Vande Hei numerous times, but cannot recall the details of those conversations. [48] ¶ 69; [54] ¶ 3. Yang never applied to the program at Aurora, and

[1] The facts are largely taken from Yang's response to defendants' LR 56.1 statement, [48], and defendants' response to Yang's LR 56.1 statement, [54]. Any arguments raised in the LR 56.1 statements will be disregarded. Only those facts which are properly controverted will be considered disputed. Where a party disputes a fact but fails to follow LR 56.1's direction to cite to supporting material in the record, that fact will be considered undisputed.

four non-Asian-American co-workers applied for and gained admission to the program. [48] ¶ 65; [54] ¶¶ 4–5. Also while at the Aurora service center, on more than ten occasions, Yang reported to work at his scheduled start time, but had to wait two hours before he could start his work. [54] ¶ 6.

On February 1, 2011, FedEx Freight officially merged with a separate entity, FedEx National. [48] ¶ 11. FedEx National operated a service center in Schaumburg, Illinois. [48] ¶ 12. In advance of that merger, on December 16, 2010, Yang put in a request with Vande Hei to transfer from the Aurora service center to the Schaumburg location, because it was substantially closer to Yang's residence. [48] ¶ 12; [54] ¶ 7. Vande Hei approved Yang's transfer request on December 16, 2010, and defendant Roger Maco, a FedEx human resources employee, approved the request the next day. [48] ¶ 14. But when Yang asked another human resources representative for an update on January 17, 2011, he was told that the request had never been sent in, and that there was only one dock worker position available at the Schaumburg facility. [54] ¶ 9. The manager of the Schaumburg facility approved the transfer request on that day, and Vande Hei sent Yang an offer letter on January 19, 2011. [48] ¶ 15. On February 1, 2011, the scheduled date of the merger and the first day his transfer could go into effect, Yang started work as a part-time dock worker at the Schaumburg facility. [48] ¶¶ 13, 16.

In September 2011, Yang applied for the dock-to-driver program at Schaumburg and was admitted almost immediately. [48] ¶¶ 18, 71. He began the program on September 19, 2011, and was promoted to a driver position on

4

November 21, 2011, after which he transported freight between the Schaumburg service center and customers. [48] ¶ 18. Although Yang received his requested promotion, he believes he was not treated fairly as a driver. For example, Yang claims that he received a disproportionate number of route assignments that required lift-gate trailers, which are used to service residential customers and businesses that do not have loading docks. [48] ¶ 49; [54] ¶ 13. Drivers using those trailers employ hydraulic lifts to move skids of freight between the truck and the ground, and use pallet jacks to maneuver the freight skids. [48] ¶ 49. Yang did not like the lift-gate assignments because he had to move the freight. [48] ¶ 52. But he claims that he received lift-gate assignments almost every day. [54] ¶ 13.

According to FedEx, drivers bid on shift start times based on their seniority, and all route assignments, including lift-gate assignments, are assigned to a driver whose start time closely follows the loading of the truck.[2] [48] ¶ 47. Defendant Kevin Lee, who had become manager of the Schaumburg facility on September 16, 2013, testified that he had reviewed records related to lift-gate assignments, and found that during the six months he and Yang worked together, a Hispanic driver received the most lift-gate assignments, a Caucasian driver received the second-highest number of assignments, and Yang and another Caucasian driver tied for

[2] In his affidavit, Yang claims that some lift-gate routes were assigned to him, even when those trucks were fully loaded and ready to go before his scheduled start time, and non-Asian-American employees were available. But this contradicts his deposition testimony that he did not know how lift-gate routes were assigned or when they were supposed to start, and "a deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies." *Abraham v. Washington Group Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014). Yang's statement in his affidavit is not considered part of the summary judgment record.

third with 75 assignments each.[3] [48] ¶ 55. Lee also identified four other Caucasian drivers and one Hispanic driver who performed lift-gate deliveries consistently. [48] ¶ 54. Yang concedes that two Caucasian employees used the facility's lift-gate trailers on a semi-regular basis, but claims that if one of those employees did not use a lift-gate trailer, a minority employee would replace him. [54] ¶ 14. Yang also claims that he injured himself while operating a lift-gate trailer, and after he recovered and returned to work, he was given lift-gate assignments even after informing nonparty Operations Manager John Carey that he did not want those assignments.[4] [45-1] at 46; [54] ¶ 21.

Yang also claims that he was often forced to use equipment that was in poor condition. [54] ¶ 22. He states in his affidavit that he complained about his faulty equipment to managers John Carey, Paula Litch, and Tom Kress, and that they ignored him and signaled that his complaints could lead to termination.[5] [54] ¶ 23. Yang's complaints apparently never reached Lee, who testified that he was unaware

---

[3] Yang accuses Lee of lying about these statistics, but presents no evidence to dispute them.

[4] It is unclear if Yang ever notified management or human resources about the lift-gate assignments. His response to defendants' LR 56.1 statement of facts suggests that he did not for fear of retaliation, *see* [48] ¶ 58, and he explicitly testified at his deposition that he did not, *see* [45-1] at 68, but he also testified that he told Operations Manager Carey that he did not want any lift-gate assignments after injuring his back, *see* [45-1] at 46. Because credibility determinations are reserved for a jury, Yang's conflicting testimony will be resolved in his favor, and it will be assumed that he did complain to management about his lift-gate assignments.

[5] Yang does not provide any details regarding these conversations, and defendants claim that Yang did not mention them in his deposition. But the deposition transcript reveals that Yang did testify that he complained to management about faulty equipment. *See* [45-1] at 68.

6

of any outstanding mechanical issues, but that employee complaints about equipment in need of repair were addressed as a matter of policy. [54] ¶ 33.

In July 2012, Yang engaged in a verbal altercation with a co-worker named Michael Peplow. [48] ¶ 23. Yang parked his vehicle in front of the loading dock door where Peplow was working, and when Peplow asked him to move, Yang engaged in a verbal exchange with him. [48] ¶ 23. Peplow later complained to management, accusing Yang of attempting to provoke him with aggressive behavior, and of using a racial slur, which Yang denied. [48] ¶¶ 24–25. Maco investigated the complaint, but could not corroborate Peplow's allegation that Yang had used the racial slur, so FedEx did not discipline Yang. [48] ¶ 25.

On March 7, 2014, Yang engaged in an altercation with dock worker Brian Panek, which they both reported to management. [48] ¶¶ 26, 35. Panek accused Yang of throwing at Panek's chest and lap a McDonald's bag containing a nearly empty cup while Panek was operating a forklift, and that some ice spilled onto him. [48] ¶ 26. Yang denies throwing the bag, but admits that he placed or shoved the bag onto Panek's lap, and also admits that he was wrong to do so. [48] ¶¶ 31–32. Panek got off his forklift and confronted Yang. [48] ¶ 27. Yang reported that, during their exchange, Panek called him a "fucking chink." [48] ¶ 27. Panek denied this in his discussions with management, claiming instead that he called Yang "an asshole." [48] ¶ 28. He also said that Yang had been verbally taunting him, using other offensive terminology. [48] ¶ 29. Panek reported that Yang had always been

loud and rude to him, while Yang characterizes their relationship as one where they frequently kid around with each other. [48] ¶ 30.

On March 10, 2014, Maco and defendant Kevin Lee, who had become manager of the Schaumburg facility on September 16, 2013, reviewed surveillance video of the incident and Panek's and Yang's written statements, and then met separately with the two. [48] ¶¶ 19, 36. After the meetings, Lee sought from Panek a more detailed written statement. [54] ¶ 31. He also spoke to two witnesses, who implicated Yang as the instigator and aggressor and reported that they had not heard Panek calling Yang a "fucking chink." [48] ¶ 38. Lee and Maco then relieved both Panek and Yang of duty pending the outcome of the investigation. [48] ¶ 37. Yang claims that, although FedEx had not yet decided if and how Yang would be disciplined, and nobody explicitly fired him or told him to leave, he understood from Lee that he should seek employment elsewhere. [48] ¶¶ 61–63; [54] ¶ 28. The next day, Yang called Lee and resigned. [48] ¶ 39. The offensive comment was never confirmed, but once the investigation was complete, Lee and Maco officially disciplined Panek by issuing him a "Critical Corrective Action" and a three-day suspension. [48] ¶ 40.

Yang knew that fighting and "horseplay" among co-workers could result in discharge. [48] ¶¶ 20–21. But he claims that he has seen non-Asian-American employees of FedEx engage in horseplay without being disciplined by management. [54] ¶ 35. Yang was also aware that FedEx has a non-discrimination policy and procedures through which he could complain about discrimination, but testified that

8

he thought complaining might result in retaliation. [48] ¶ 22. Yang admits that no manager at either facility made racist comments to him, and the only racist comment Yang complained about was Panek's March 7, 2014 comment. [48] ¶ 75.

### III. Analysis

Yang conflates two distinct claims in his response brief: one of disparate treatment and one of hostile work environment. Both derive from the same set of facts—Yang believes his employer discriminated against him based on his race—but the legal analysis involved in each of these claims is different. Yang presents his argument under the heading, "Hostile Work Environment," and correctly identifies the standard applicable to such a claim, but his supporting argument and case law relate to a claim of disparate treatment.

#### A. Hostile Work Environment

Summary judgment on the hostile work environment claim under § 1981 is proper unless there is a "material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability."[6] *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Yang must show that the conduct had "a racial character or purpose" and was "both subjectively and objectively so severe or pervasive that it altered the conditions of his employment."

---

[6] The standards for claims of hostile work environment, racial discrimination, and retaliation under Title VII and § 1981 are the same. *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1028 (7th Cir. 2004).

9

*Id.* Courts must "not focus on discrete acts of individual employees . . . , but must consider the entire context of the workplace." *Id.*

A court may consider several factors to determine whether a work environment is objectively hostile, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ford v. Minteq Shapes & Services, Inc.*, 587 F.3d 845, 847 (7th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Yang believes he faced harassment and discriminatory conduct based on his race, and that it amounted to a hostile or abusive work environment. In support of his claim, he notes that at the Aurora branch, his managers did not admit him into the dock-to-driver program, called him in to work up to two hours before he had any work to do on at least ten occasions, and intentionally delayed the input of his transfer to the Schaumburg branch. And Yang alleges that at the Schaumburg branch, his managers gave him a disproportionately high number of lift-gate assignments, provided him with faulty equipment, and forced him to resign after his altercation with Panek.

Defendants argue that some of the acts Yang identifies as contributing to a hostile work environment were separate and discrete acts for which he must bring independent claims of racial discrimination. Specifically, defendants contend that FedEx's failure to promote Yang to a driver position and the delay in transferring him to the Schaumburg branch can be considered only as the bases for separate

10

claims of disparate treatment. The nature of a hostile work environment claim demands that a court consider a series of separate acts that collectively constitute one "unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, (2002). But discrete acts such as failure to promote, denial of transfer, and termination, if discriminatory, constitute separate and independently actionable unlawful employment practices. *See Morgan*, 536 U.S. at 114. Those discrete acts are different in nature from the repeated conduct underlying a hostile work environment claim. *See id.* at 115. To the extent that any of the complained-of conduct constitutes one employment practice that could sustain a hostile work environment claim, it would not include the failure to promote Yang, the denial or delay of transfer, or Yang's separation from the company.

For the remaining conduct that Yang identifies in support of his hostile work environment claim, he provides no evidence to suggest racial character or purpose. Yang admits that none of his managers made any racist comments towards him, and the only racist comment on the record is the one that may have been uttered by his co-worker after Yang put a bag of trash on his lap. Even if that co-worker were a racist, he did not have the decision-making authority to terminate Yang, and he had nothing to do with the rest of Yang's grievances, which do not have any independent racial component. Yang complains that he sometimes had to wait for two hours after his scheduled start time at the Aurora location before he could perform his job duties, but cannot show that other employees did not experience the same scheduling difficulties, or that race played a factor in this. He complains about

11

having to use faulty equipment at the Schaumburg facility, but cannot show that his experience differed from that of non-Asian-American employees. Yang also argues that the lift-gate assignments were administered in a discriminatory fashion,[7] although he does not provide any evidence to show that they were assigned based on race rather than seniority and timing. Further, he admits that Caucasian employees also worked those assignments on a regular or semi-regular basis, and the record shows that other Caucasian and non-Asian-American employees received lift-gate assignments frequently (and sometimes even more frequently than Yang). Without any evidence that the complained-of conduct was related to Yang's race in either character or purpose, he cannot use it to sustain a claim for hostile work environment.[8]

Defendants also argue that the conduct Yang complains about was neither subjectively nor objectively so severe and pervasive that it altered the conditions of his employment. Aside from his reporting of his co-worker Panek's racist comment, Yang never complained to management about discrimination, even though he was

[7] Yang alternates between claiming discrimination against non-Caucasian employees or against Asian-American employees in particular. With respect to lift-gate assignments, he argues that his managers discriminated against both, but with more severity against Asian-American employees. *See* [49] at 8.

[8] Yang cannot even tie race to the discrete acts—failing to promote Yang, delaying the processing of his transfer request, and relieving him of duty following his altercation with a co-worker. The most damning evidence he points to is the unequal discipline issued to himself and Panek. Yang says that he was relieved of duty indefinitely and might have been told to move on, while Panek was given a three-day suspension. But that suspension was given to Panek once the investigation had concluded. He was originally relieved of duty pending the outcome of the investigation, just like Yang, and Yang resigned before any formal discipline was issued. Yang claims that Lee had already decided to fire him, but that does not suggest a racial motivation, given that the video evidence and witness statements identified Yang as the aggressor.

aware of the company's non-discrimination policy. Defendants use this to suggest that Yang did not subjectively perceive his work environment as hostile or offensive. It is odd that he neglected to complain about discrimination even when he thought his termination imminent, choosing instead to resign, but it may be that his lack of complaining simply reflects a fear that filing a complaint could lead to his termination.

Even if Yang subjectively believed his work environment to be hostile, he cannot show that the complained-of conduct rises to the level of objective hostility. He found lift-gate assignments objectionable, but unless there were evidence in the record showing that those assignments were distributed in a discriminatory manner (and there is not), "being assigned duties that were part of one's job description" does not amount to a hostile work environment. *Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009). Likewise, the other conduct Yang identifies fails to satisfy the requirements of a hostile work environment claim. He does describe objectionable conduct—being forced to wait for two hours before the beginning of his shift on roughly ten separate occasions over the course of fifteen months of part-time employment at the Aurora facility, assigned equipment in need of repair, and subjected to a racial slur on one occasion—but "'offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 361 (7th Cir.1998)). Even if the conduct supporting his claim included evasion and delay tactics by

13

Aurora branch manager Vande Hei regarding Yang's requests for a promotion and transfer, or a suggestion by Schaumburg branch manager Lee that Yang should move on to other employment, the conduct would not amount to the "objectively hellish environment" that would sustain his claim. *Hendricks v. Illinois Dept. of Human Services*, 80 Fed.Appx. 489, 492 (7th Cir. 2003).

Therefore, summary judgment on Yang's claim of hostile work environment is granted in favor of defendants.

### B. Disparate Treatment

To avoid summary judgment on a disparate treatment claim under the direct method of proof, as Yang seeks to do, a plaintiff must present "sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). The three categories of acceptable circumstantial evidence are: 1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn;" 2) evidence of the employer systematically treating similarly situated employees of a different race better; and 3) "evidence that the plaintiff suffered an adverse employment action and that the employer's justification is pretextual." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733–34 (7th Cir. 2011). "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or

14

they can be used together." *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Again, it is unclear if Yang is pursuing a claim of disparate treatment, because he identifies his claim as one for a hostile work environment and cites the appropriate standard for that type of claim, but attempts to prove that claim by invoking the direct method of proof for disparate treatment claims. As discussed above, he also identifies as evidence in support of his hostile environment claim three discrete acts which could conceivably constitute adverse employment actions that are actionable in their own right as the bases of disparate treatment claims. And he does argue that those actions—failing to promote him at the Aurora branch, delaying his request to transfer to the Schaumburg location, and forcing him to resign—were motivated by his employer's discriminatory intent.

However, Yang does not respond to defendants' argument that any § 1981 claims based on the lack of promotion or delay in Yang's transfer request are time-barred, as they accrued more than four years before his complaint was filed, and § 1981 claims have a four-year statute of limitations. 28 U.S.C. § 1658(a). Because a failure to respond to an argument constitutes waiver, summary judgment is granted in defendants' favor on those claims.

Even if those claims were not time-barred, they would fail as a matter of law because Yang provides no evidence to suggest that his employer's actions were motivated by racially discriminatory intent or that they constituted adverse employment actions. His failure to promote claim is based on Vande Hei's failure to

15

encourage and affirmatively approve of Yang's application to the dock-to-driver program because of his race, but Yang does not provide any direct or circumstantial evidence that race played a role. Further, he admits that he was unfamiliar with the application process and never actually applied. There is also no indication that race factored into the delay in processing his request to transfer to the Schaumburg location. And he began work in Schaumburg as soon as that facility became affiliated with his employer, so his request was ultimately honored. His only evidence of discriminatory intent consists of his own subjective beliefs, but "[i]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Yancick*, 653 F.3d at 544 (quoting *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir.2006)).

A claim of disparate treatment based on Yang's separation from the company also fails. Yang argues he was forced to resign, because he had been relieved of duty with no specific return date, and Lee suggested to him, in either form or substance, that he move on. While Lee denies making such a suggestion, it would not amount to forced resignation, or constructive discharge. "To state a claim for constructive discharge, a plaintiff needs to show that his working conditions were so intolerable that a reasonable person would have been compelled to resign." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). A "failure to object to egregious conditions or to seek some form of redress is compelling evidence that the employee, or any reasonable worker, would not find the conditions intolerable." *Mosher v. Dollar Tree*

16

*Stores, Inc.*, 240 F.3d 662, 667 (7th Cir. 2001). "Absent extraordinary conditions, 'a complaining employee is expected to remain on the job while seeking redress.'" *Id.* (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir.1997)). Yang never complained to anyone at FedEx about any racially discriminatory behavior (aside from Panek's one comment) before resigning. And none of the working conditions he describes are extraordinary or intolerable. Lee's vague suggestion that Yang consider moving on was not sufficient to compel a reasonable person to quit. Yang was not constructively discharged; he called Lee the day after their conversation and he resigned. Therefore, he did not suffer an adverse employment action.

Yang has not presented facts upon which a reasonable jury could find that anyone at FedEx took an adverse employment action against him because of his race. Therefore, his claim fails as a matter of law.

## C. Retaliation[9]

To establish retaliation under the direct method, as Yang seeks to do, he must show (1) that he engaged in protected activity; (2) that defendants took an adverse employment action against him; and (3) a causal connection between his protected activity and the adverse employment action. *Coleman*, 667 F.3d at 859. As

---

[9] Defendants believe Yang abandoned his retaliation claim because, in his deposition, he was asked whether he had a claim for retaliation and he answered "No." [45-1] at 60. Yang's attorney objected to this question because it called for a legal conclusion. He was also asked if he had ever complained about discrimination in the workplace, and after some prompting by defendants' counsel, Yang answered "No." *Id.* Defendants rely on this exchange to support their argument that Yang abandoned his claim, but they ignore Yang's earlier responses where he clearly discusses the complaint he filed against fellow co-worker Panek after their argument. [45-1] at 21–22. Yang did not abandon his retaliation claim in his deposition.

with a disparate treatment claim, Yang can make use of three categories of circumstantial evidence to prove his claim.

Yang argues that the retaliation here took the form of management influencing him to quit his job because he had complained about racial harassment by Panek. Yang also contends that other non-Asian-American employees at the Schaumburg location were not disciplined as harshly as he when engaging in the same conduct (i.e., the "horseplay" that led to his suspension), suggesting that defendant's reasoning for its actions was pretextual.

Defendants argue that Yang voluntarily resigned, and deny that their actions surrounding Yang's suspension amounted to a constructive discharge. As stated above, Yang cannot show that he was constructively discharged. If Yang is correct in that Lee wanted to terminate him, and would have carried out that termination if given the chance, Yang did not give him that chance. Thus, he fails to satisfy the second prong of the test requiring an adverse employment action.

Even if Yang could prove that he was constructively discharged, or if he identified the suspension as an adverse employment action, he does not identify any evidence of a causal connection between his separation and his complaint of racial harassment by Panek. As defendants note, the only evidence on the record that could be used to support a causal connection is the timing of the two events. But "evidence regarding suspicious timing, without more, is generally insufficient to support a reasonable inference of retaliation." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012). Yang does not provide sufficient evidence to suggest

18

that defendants' reasoning for the suspension—that Yang was involved in an argument with a co-worker—was pretextual.[10] Aside from temporal proximity, Yang does not provide any evidence, either direct or circumstantial, showing that any adverse employment action resulting in his separation was caused by his complaint of racial harassment.

No reasonable jury could conclude that Yang's employment at FedEx was terminated in retaliation for complaining about racial harassment. Therefore, summary judgment on his retaliation claim is granted in favor of defendants.

## IV. Conclusion

Defendants' motion for summary judgment, [44], is granted. Enter judgment in favor of defendants, and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: 6/23/16

---

[10] Defendants correctly note that Yang's vague and conclusory statement that non-Asian-American (but otherwise unidentified) employees engaged in similar conduct without being disciplined is insufficient to defeat summary judgment. Yang provides no details as to what type of conduct he observed or who he saw engaging in such conduct. Nor does he provide any basis for his claim that these employees suffered no consequences. Without adequate foundation, Yang's statement is inadmissible.